# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KEVIN DARNELL BRYANT, | 1:12-cv-02074-DAD-GSA-PC |
| Plaintiff, | FINDINGS AND RECOMMENDATIONS, RECOMMENDING THAT DEFENDANT WADDLE'S MOTION FOR SUMMARY JUDGMENT BE DENIED |
| v. | |
| R. ROMERO, et al., | (ECF No. 96.) |
| Defendants. | OBJECTIONS, IF ANY, DUE WITHIN FOURTEEN (14) DAYS |

## I. BACKGROUND

Kevin Darnell Bryant ("Plaintiff"), a state prisoner proceeding with counsel, filed this civil rights action pursuant to 42 U.S.C. § 1983 on December 26, 2012.  (ECF No. 1.)  This case now proceeds with the First Amended Complaint ("FAC"), filed on December 2, 2013, against defendants Lieutenant (Lt.) Constance Waddle and Correctional Officer (C/O) E. Castellanos, for retaliation against Plaintiff in violation of the First Amendment.  (ECF No.16.)

On April 1, 2016, defendant Waddle ("Defendant") filed a motion for summary judgment.  Fed. R. Civ. P. 56.  (ECF No. 96.)  On June 16, 2017, Plaintiff filed an opposition, and on June 30, 2017, Defendant filed a reply.[1]  (ECF No. 203.)  The motion has been submitted upon the record

---

[1] At the time the motion for summary judgment was filed, Plaintiff was proceeding pro se in this action.  Thus, concurrently with her motion for summary judgment, Defendant served Plaintiff with the requisite notice of the requirements for opposing the motion.  Woods v. Carey, 684 F.3d 934, 939-41 (9th Cir. 2012); Rand v. Rowland, 154 F.3d 952, 960-61 (9th Cir. 1998).  (ECF No. 96 at 2-3.)

without oral argument pursuant to Local Rule 230(*l*), and for the reasons that follow, Defendant's motion should be denied.

**II.  SUMMARY JUDGMENT STANDARD**

Any party may move for summary judgment, and the court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a) (quotation marks omitted); Washington Mut. Inc. v. U.S., 636 F.3d 1207, 1216 (9th Cir. 2011).  Each party's position, whether it be that a fact is disputed or undisputed, must be supported by (1) citing to particular parts of materials in the record, including but not limited to depositions, documents, declarations, or discovery; or (2) showing that the materials cited do not establish the presence or absence of a genuine dispute or that the opposing party cannot produce admissible evidence to support the fact. Fed. R. Civ. P. 56(c)(1) (quotation marks omitted).  The court may consider other materials in the record not cited to by the parties, but it is not required to do so.  Fed. R. Civ. P. 56(c)(3); Carmen v. San Francisco Unified Sch. Dist., 237 F.3d 1026, 1031 (9th Cir. 2001); accord Simmons v. Navajo Cnty., Ariz., 609 F.3d 1011, 1017 (9th Cir. 2010).

Defendant does not bear the burden of proof at trial and in moving for summary judgment, he or she need only prove an absence of evidence to support Plaintiff's case.  In re Oracle Corp. Sec. Litig., 627 F.3d 376, 387 (9th Cir. 2010) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548 (1986)).  If the defendant meets his or her initial burden, the burden then shifts to the plaintiff "to designate specific facts demonstrating the existence of genuine issues for trial."  In re Oracle Corp., 627 F.3d at 387 (citing Celotex Corp., 477 U.S. at 323).  This requires the plaintiff to "show more than the mere existence of a scintilla of evidence."  Id. (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252, 106 S.Ct. 2505 (1986)).

However, in judging the evidence at the summary judgment stage, the court may not make credibility determinations or weigh conflicting evidence, Soremekun v. Thrifty Payless, Inc., 509 F.3d 978, 984 (9th Cir. 2007) (quotation marks and citation omitted), and it must draw all inferences in the light most favorable to the nonmoving party and determine whether a genuine issue of material fact precludes entry of judgment, Comite de Jornaleros de Redondo Beach v.

1  <u>City of Redondo Beach</u>, 657 F.3d 936, 942 (9th Cir. 2011) (quotation marks and citation omitted).

2  The court determines only whether there is a genuine issue for trial.  <u>Thomas v. Ponder</u>, 611 F.3d

3  1144, 1150 (9th Cir. 2010) (quotation marks and citations omitted).

4  **III.    ALLEGATIONS IN THE FIRST AMENDED COMPLAINT (FAC)[2]**

5      Plaintiff is presently incarcerated at Salinas Valley State Prison.  The events at issue

6  occurred in 2010 and 2011 at Kern Valley State Prison (KVSP) in Delano, California, when

7  Plaintiff was incarcerated there.

8      Plaintiff alleges as follows in his amended complaint.  On June 7, 2010, Plaintiff filed a

9  form 602 prison appeal against C/Os R. Romero and Patrick Gallagher concerning Plaintiff's

10 prison job assignment.  On November 30, 2010, defendant Lt. Waddle found out that Plaintiff had

11 filed the appeal, and she ordered Plaintiff locked up in administrative segregation (Ad-Seg)

12 claiming that she and Captain Cano were doing this to prevent Gallagher and Romero from

13 retaliating against him if they were disciplined because of an investigation.  Plaintiff alleges,

14 however,  that Lt. Waddle did not do this to protect Plaintiff, but to have Plaintiff moved to

15 Facility D so Waddle could have Plaintiff threatened and assaulted in order to force Plaintiff to

16 drop his appeal against Gallagher and Romero.  On March 10, 2011, C/O Redmon moved Plaintiff

17 and his cell mate from Building 6 to Building 1, cell 225.  Redmon told Plaintiff that Lt. Waddle

18 wanted him moved.

19     Plaintiff alleges that Lt. Waddle conspired with C/O D. Sellers to get Plaintiff assaulted for

20 filing the 602 appeal.  Plaintiff has a signed declaration from inmate Cleave McCloud, J-55573,

21 stating that C/O Sellers told McCloud to assault Plaintiff because of the appeal.  On April 15,

22 2011, the day Sellers was planning to have Plaintiff assaulted, Associate Warden Wood called

23 Plaintiff to the Captain's Office to speak to him.  Plaintiff told Wood about Sellers and Waddle

24 conspiring to have Plaintiff assaulted by inmates in Building 1.  Wood issued an order to move

25 Plaintiff to Building 8 to try to prevent the assault.  Lt. Waddle spoke to Plaintiff on his way out,

---

[2] Plaintiff's complaint is verified and his allegations constitute evidence where they are based on his personal knowledge of facts admissible in evidence.  <u>Jones v. Blanas</u>, 393 F.3d 918, 922-23 (9th Cir. 2004).  The summarization of Plaintiff's claim in this section should not be viewed by the parties as a ruling that the allegations are admissible.  The Court will address, to the extent necessary, the admissibility of Plaintiff's evidence in the sections which follow.

telling Plaintiff that she runs this place and none of Plaintiff's 602 appeals would ever be granted at KVSP again as she knows somebody in the appeals office who is going to see to that. Waddle also told Plaintiff to be very careful about who Plaintiff files appeals or complaints against.

Plaintiff was moved to Building 8. Lt. Waddle conspired with C/O Castellanos to have some inmates in Building 8 assault him. On May 8, 2011, Castellanos withheld one of Plaintiff's outgoing letters and stole 40 stamps out of it.

On June 6, 2011, in Plaintiff's other lawsuit in this court, 1:11-cv-00046, <u>Bryant v. Gallagher</u>, Plaintiff filed an emergency motion for a temporary restraining order and protection. The court denied the motion but requested the Warden (Harrington) check to see if Plaintiff was in any danger. The Warden failed to do that.

On June 29, 2011, defendant Castellanos went into Plaintiff's cell while he was away at the law library, searched the cell, and deliberately ripped the cable off the back of Plaintiff's TV breaking off the whole piece that the cable screws onto. Now there is nothing to screw a cable onto.

In July 2011, defendant Castellanos told Plaintiff that he knew Plaintiff filed the staff misconduct appeal and the lawsuit against C/Os Gallagher and Romero, and that if he doesn't drop it all right away something bad is going to happen to Plaintiff.

On July 24, 2011, the building porter, inmate Moore #H-23858, told Plaintiff that defendant Castellanos told him to get some inmates together and have them all jump Plaintiff and hurt him badly. Inmate Moore also told Plaintiff that defendant Castellanos told him it was because of the lawsuit Plaintiff filed against his friends Gallagher and Romero.

On July 28, 2011, Sergeant (Sgt.) Rivera came to Building 8 to talk to Plaintiff. Defendant Castellanos, CCI Lane, and another officer were present. Sgt. Rivera asked Plaintiff to sign a pink 128 chrono he had, which was allegedly written by defendant Castellanos and falsely stated that Castellanos had interviewed Plaintiff about some inmates who may be out to get Plaintiff. Plaintiff told Sgt. Rivera that defendant Castellanos had not interviewed him about this. Sgt. Rivera asked Plaintiff if he knew of any inmates out to get Plaintiff. Plaintiff asked him if he and Castellanos knew of any. Sgt. Rivera refused to answer and told Plaintiff that if he didn't sign the

chrono he would lock Plaintiff up in Ad-Seg. Plaintiff told him that his (Plaintiff's) only safety concerns were about the officers who are conspiring to harm him in retaliation for his appeals and lawsuit, and if any inmates are out to harm Plaintiff it's because one of the officers paid or manipulated them to do it. Plaintiff signed the chrono under reservation of rights by writing "All Rights Reserved" above his signature. As soon as he signed it, Mr. Lane told Plaintiff, "Now if you get stabbed we are not responsible or liable and you can't sue us." (ECF No. 16 ¶28.)

On July 30, 2011, defendants Waddle and Castellanos conspired to have Plaintiff stabbed by two inmates, during which time Plaintiff believes that they were going to have the Building 8 control booth officer shoot him with a mini 14 assault rifle and try to kill him. Inmate Moore came to Plaintiff's cell and told him that defendant Castellanos had paid two inmates to assault Plaintiff by stabbing him because of the lawsuit and his failure to drop it, like defendant Castellanos had threatened. Inmate Moore lied, saying it was two Mexican inmates and Castellanos who were going to open Plaintiff's door and let them stab Plaintiff, but Plaintiff saw it was two black inmates out in the rotunda waiting. Moore was trying to trick Plaintiff into coming out of his cell so they could stab him, where they had a clear shot to shoot him. Plaintiff refused to come out of his cell. Plaintiff began packing up all of his property in big trash bags and boxes. At noon pill call, Plaintiff handed C/O B. Rodriguez a note under his cell door that said, "My life is in danger. Somebody is out to kill me." (ECF No. 16 ¶32.)

Plaintiff told C/O Rodriguez and defendant Castellanos that he wanted to be placed in Ad-Seg for his safety and wanted to talk to ISU Lt. Stiles. Defendant Castellanos became furious and started calling Plaintiff vulgar names and cursing him out. Castellanos demanded to know what Plaintiff was going to tell the lieutenant, and told Plaintiff not to go to Ad-Seg, begging Plaintiff to just let him move Plaintiff to Building 6 and not to tell anyone about this, promising not to have Plaintiff assaulted. Plaintiff refused his offer and demanded to be placed in Ad-Seg, so Castellanos began threatening Plaintiff, stating that if he told ISU Lt. Stiles that he was trying to have Plaintiff assaulted, he would send somebody to kill Plaintiff's family members and have him murdered in Ad-Seg or wherever he went. Defendant Castellanos told Plaintiff to keep his mouth

///

shut and drop the lawsuit and 602 appeals he filed, or Plaintiff and his family, including his kids, would be killed.

Defendant Castellanos and C/O Rodriguez boxed up Plaintiff's property out of Plaintiff's sight, while Plaintiff was locked in the shower stall, and Castellanos stole over $500 worth of Plaintiff's property, including photos of Plaintiff and his family and two address books containing their addresses. They moved Plaintiff to a holding cage in the program office where Castellanos continued to threaten Plaintiff and asked him not to go to Ad-Seg or tell ISU what happened. Defendant Castellanos told Plaintiff he stole Plaintiff's property and admitted that he deliberately broke Plaintiff's TV on June 29, 2011, because he did not drop the lawsuits and appeals, and told Plaintiff he would not get his property back unless he did this right now.

On or about August 2, 2011, Lt. Waddle came to Ad-Seg to allegedly videotape his statement, but Plaintiff refused to talk to her unless ISU Lt. Stiles was present. She became furious, cursed Plaintiff, and told Plaintiff he would get what he had coming. She tried to trick Plaintiff into giving a statement, but he did not fall for it.

Before Plaintiff gave any statement or saw anyone from ISU, defendant Waddle and Captain Henderson generated a false investigation report which stated they had investigated all of Plaintiff's allegations and nothing was found. They recommended that Plaintiff be sent back to D-yard. Plaintiff explained to Warden Martin D. Biter on August 9, 2011, that the report was untrue.

On August 17, 2011, defendant Waddle arranged to have inmate Cleave McCloud put in Plaintiff's cell by force, because Plaintiff refused to accept him. McCloud admitted to Plaintiff that Lt. Waddle told him to assault Plaintiff and force him to drop his lawsuit and appeals, and stop Plaintiff from telling ISU what she and Castellanos conspired to do to Plaintiff. Plaintiff has a second signed declaration from McCloud stating what Lt. Waddle told him to do.

Plaintiff also found out that defendant Castellanos wrote a false 115 RVR stating that he found a razor blade in Plaintiff's property on July 30, 2011. Castellanos had told Plaintiff he was going to do this if Plaintiff didn't do what Castellanos wanted.

All the time that the defendants threatened to harm Plaintiff and his family, he was in constant fear for his life and his family's lives, and he had to repeatedly talk to his psychiatric case

workers about his fears, and they documented it every time.  Plaintiff was interviewed about these events by ISU Lt. Stiles and each interview was recorded by him, and he alleged that an investigation would be conducted.  Prison officials, ISU staff, and the defendants conspired to cover it all up to protect the defendants.

Based on these allegations, Plaintiff claims violations of the First Amendment.

## IV.   SUMMARY JUDGMENT BASED ON EXHAUSTION

### A.   Legal Standards

#### 1.   Statutory Exhaustion Requirement

Section 1997e(a) of the Prison Litigation Reform Act of 1995 (PLRA) provides that "[n]o action shall be brought with respect to prison conditions under [42 U.S.C. § 1983], or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."  42 U.S.C. § 1997e(a).  Prisoners are required to exhaust the available administrative remedies prior to filing suit.  Jones v. Bock, 549 U.S. 199, 211, 127 S.Ct. 910, 918-19 (2007); McKinney v. Carey, 311 F.3d 1198, 1199-1201 (9th Cir. 2002).  Exhaustion is required regardless of the relief sought by the prisoner and regardless of the relief offered by the process, Booth v. Churner, 532 U.S. 731, 741, 121 S.Ct. 1819 (2001), and the exhaustion requirement applies to all prisoner suits relating to prison life, Porter v. Nussle, 534 U.S. 516, 532, 122 S.Ct. 983, 993 (2002).

"[T]o properly exhaust administrative remedies prisoners 'must complete the administrative review process in accordance with the applicable procedural rules,' [ ]—rules that are defined not by the PLRA, but by the prison grievance process itself."  Jones, 549 U.S. at 218 (quoting Woodford v. Ngo, 548 U.S. 81, 88, 126 S.Ct. 2378, 2386, 165 L.Ed.2d 368 (2006)).  See also Marella v. Terhune, 568 F.3d 1024, 1027 (9th Cir. 2009) ("The California prison system's requirements 'define the boundaries of proper exhaustion.'").  An untimely or otherwise procedurally defective appeal will not satisfy the exhaustion requirement. Woodford, 548 U.S. at 90.  However, the Ninth Circuit has made clear:  A grievance need not include legal terminology or legal theories unless they are in some way needed to provide notice of the harm being grieved.

///

Griffin v. Arpaio, 557 F.3d 1117, 1120 (9th Cir. 2009).  A grievance also need not contain every fact necessary to prove each element of an eventual legal claim.  Id.

Moreover, the Ninth Circuit has recognized that a grievance suffices to exhaust a claim if it puts the prison on adequate notice of the problem for which the prisoner seeks redress. To provide adequate notice, the prisoner need only provide the level of detail required by the prison's regulations.  Sapp v. Kimbrell, 623 F.3d 813, 824 (9th Cir. 2010) (citing Jones, 549 U.S. at 218). The primary purpose of a grievance is to alert the prison to a problem and facilitate its resolution, not to lay groundwork for litigation.  Id; Griffin, 557 F.3d at 1120; see also Jones, 549 U.S. at 219 (citing Johnson v. Johnson, 385 F.3d 503, 522 (5th Cir. 2004) ("We are mindful that the primary purpose of a grievance is to alert prison officials to a problem, not to provide personal notice to a particular official that he may be sued; the grievance process is not a summons and complaint that initiates adversarial litigation."). Thus, in this case "[t]he California prison system's requirements define the boundaries of proper exhaustion." Marella, 568 F.3d at 1027).

A prisoner may be excused from complying with the PLRA's exhaustion requirement if he establishes that the existing administrative remedies were effectively unavailable to him. See Albino v. Baca, 747 F.3d 1162, 1172-73 (9th Cir. 2014). When an inmate's administrative grievance is improperly rejected on procedural grounds, exhaustion may be excused as "effectively unavailable." Sapp, 623 F.3d at 823; see also Nunez v. Duncan, 591 F.3d 1217, 1224–26 (9th Cir. 2010) (warden's mistake rendered prisoner's administrative remedies "effectively unavailable"); Ward v. Chavez, 678 F.3d 1042, 1044-45 (9th Cir. 2012) (exhaustion excused where futile); Brown v. Valoff, 422 F.3d 926, 940 (9th Cir. 2005) (plaintiff not required to proceed to third level where appeal granted at second level and no further relief was available); Marella, 568 F.3d 1024 (excusing an inmate's failure to exhaust because he did not have access to the necessary grievance forms to timely file his grievance).

A California prisoner is required to submit an inmate appeal at the appropriate level and proceed to the highest level of review available to him.  Butler v. Adams, 397 F.3d 1181, 1183 (9th Cir. 2005); Bennett v. King, 293 F.3d 1096, 1098 (9th Cir. 2002); see also Cal. Code Regs. tit. 15, § 3084.1(b) (explaining that a cancellation or rejection of an inmate's appeal "does not

exhaust administrative remedies"). However, a prisoner need not "press on to exhaust further levels of review once he has received all 'available' remedies at an intermediate level of review or has been reliably informed by an administrator that no remedies are available." Brown, 422 F.3d at 936 (citing Booth, 532 U.S. at 736–739; see also Finley v. Skolnik, 616 Fed. Appx. 263, 264 (9th Cir. 2012 (Reversing dismissal for failure to exhaust). Where prison officials improperly screen out inmate grievances, they render administrative remedies effectively unavailable. See Sapp, 623 F.3d at 823. In such a case, "the inmate cannot pursue the necessary sequence of appeals." Id.

In submitting an inmate grievance, California regulations require a prisoner to "list all staff members involved" and to "describe their involvement in the issue." Cal. Code Regs. tit. 15, § 3084.2(3). However, the Ninth Circuit has recently held that "a prisoner exhausts such administrative remedies as are available . . . under the PLRA despite failing to comply with a procedural rule if prison officials ignore the procedural problem and render a decision on the merits of the grievance at each available step of the administrative process." Reyes v. Smith, 810 F.3d 654, 658 (9th Cir. 2016); see also Franklin v. Foulk, 2017 WL 784894, at *4-5 (E.D. Cal. Mar. 1, 2017); Franklin v. Lewis, 2016 WL 4761081, at *6 (N.D. Cal. Sept. 13, 2016). Thus, a prisoner's failure to list all staff members involved in an incident in his inmate grievance, or to fully describe the involvement of staff members in the incident, will not necessarily preclude his exhaustion of administrative remedies. Reyes, 810 F.3d at 958; Franklin v. Foulk, 2017 WL 784894, at *4 ("[T]he court in Reyes found that even though the plaintiff's grievance failed to name two physicians on the prison's three-person pain committee, prison officials were put on notice of the nature of the wrong alleged in the suit—that the plaintiff was wrongfully denied pain medication."); Franklin v. Lewis, 2016 WL 4761081, at *6 ("[T]o the extent Defendants argue that Plaintiff failed to comply with a procedural requirement by not naming Defendants in [his appeal], this deficiency is not necessarily fatal to Plaintiff's claim pursuant to Reyes"); Grigsby v. Munguia, No. 2:14-cv-0789 GAB AC P, 2016 WL 900197, at *11-12 (E.D. Cal. Mar. 9, 2016); see also Bulkin v. Ochoa, 2016 WL 1267265, at *1-2 (E.D. Cal. Mar. 31, 2016).

Nonetheless, for administrative remedies to be exhausted by California prisoners as to defendants who were not identified in the inmate grievance, there must be a "sufficient

connection" between the claim in the appeal and the unidentified defendants such that prison officials can be said to have had "notice of the alleged deprivation" and an "opportunity to resolve it." Reyes, 810 F.3d at 959 (finding that plaintiff had satisfied PLRA exhaustion requirements as to two prison doctors despite not having identified them in his inmate appeals because there was a sufficient connection between plaintiff's appeal based on inadequate pain management, and the doctors, who served on the prison committee that had denied plaintiff medication); McClure v. Chen, No. 1:14-cv-00932-DAD-GSA-PC, 2017 WL 1148135, (E.D. Cal. March 28, 2017) (remedies exhausted even though doctors not named in appeal; prison was placed on notice)) .

## 2. California Department of Corrections and Rehabilitation (CDCR) Administrative Grievance System

The court takes judicial notice of the fact that the State of California provides its prisoners and parolees the right to appeal administratively "any policy, decision, action, condition, or omission by the department or its staff that the inmate or parolee can demonstrate as having a material adverse effect upon his or her health, safety, or welfare." Cal. Code Regs. tit. 15, § 3084.1(a). The process is initiated by submitting a CDCR Form 602. Id. at § 3084.2(a).

California prisoners are required to submit appeals within thirty calendar days of the event being appealed, and the process is initiated by submission of the appeal at the first level. Id. at §§ 3084.7(a), 3084.8(c) Three levels of appeal are involved, including the first level, second level, and third level. Id. at § 3084.7. The third level of review exhausts administrative remedies. Id. at § 3084.7(d)(3). A final decision at the third level[3] of review satisfies the exhaustion requirement under 42 U.S.C. § 1997e(a). Lira v. Herrera, 427 F.3d 1164, 1166 (9th Cir. 2005). In order to satisfy § 1997e(a), California state prisoners are required to use this process to exhaust their claims prior to filing suit. Woodford, 548 U.S. at 85 (2006); McKinney, 311 F.3d. at 1199-1201.

## 3. Motion for Summary Judgment for Failure to Exhaust

The failure to exhaust in compliance with section 1997e(a) is an affirmative defense under which defendants have the burden of raising and proving the absence of exhaustion. Jones, 549

---

[3] The third level is sometimes known as the Director's level.

U.S. at 216; <u>Wyatt v. Terhune</u>, 315 F.3d 1108, 1119 (9th Cir. 2003). On April 3, 2014, the Ninth Circuit issued a decision overruling <u>Wyatt</u> with respect to the proper procedural device for raising the affirmative defense of exhaustion under § 1997e(a). <u>Albino</u> ("Albino II"), 747 F.3d at 1168–69. Following the decision in <u>Albino II</u>, defendants may raise exhaustion deficiencies as an affirmative defense under § 1997e(a) in either (1) a motion to dismiss pursuant to Rule 12(b)(6)[4] or (2) a motion for summary judgment under Rule 56. <u>Id.</u> If the court concludes that Plaintiff has failed to exhaust, the proper remedy is dismissal without prejudice of the portions of the complaint barred by § 1997e(e). <u>Jones</u>, 549 U.S. at 223–24; <u>Lira</u>, 427 F.3d at 1175–76.

Summary judgment is appropriate when it is demonstrated that there "is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); <u>Albino II</u>, 747 F.3d at 1169 ("If there is a genuine dispute about material facts, summary judgment will not be granted.") A party asserting that a fact cannot be disputed must support the assertion by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials, or showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). In judging the evidence at the summary judgment stage, the court "must draw all reasonable inferences in the light most favorable to the nonmoving party." <u>Comite de Jornaleros de Redondo Beach</u>, 657 F.3d at 942. The court must liberally construe Plaintiff's filings because he is a pro se prisoner. <u>Thomas</u>, 611 F.3d at 1150.

In a summary judgment motion for failure to exhaust administrative remedies, the defendants have the initial burden to prove "that there was an available administrative remedy, and that the prisoner did not exhaust that available remedy." <u>Albino II</u>, 747 F.3d at 1172. If the defendants carry that burden, "the burden shifts to the prisoner to come forward with evidence showing that there is something in his particular case that made the existing and generally

---

[4] Motions to dismiss under Rule 12(b)(6) are only appropriate "[i]n the rare event a failure to exhaust is clear on the face of the complaint." <u>Albino II</u>, 747 F.3d at 1162.

available administrative remedies effectively unavailable to him." Id. The ultimate burden of proof remains with defendants, however. Id. "If material facts are disputed, summary judgment should be denied, and the district judge rather than a jury should determine the facts." Id. at 1166.

**B.    Defendant Waddle's Motion**

Defendant argues that there is no evidence, except Plaintiff's vague allegations in the FAC, that Plaintiff filed any 602 appeals against Defendant.   In support of this argument, Defendant cites Plaintiff's FAC (ECF No. 16); the declarations of defendant Waddle (Appendix, Exh. B, ECF No. 96-2 at 24-28), Appeals Coordinator D. Tarnoff (Id., Exh. C, ECF No. 96-2 at 29-32), Appeals Coordinator B. Daveiga, (ECF No. 98-1 at 4-5 (Exh. A)), and M. Voong (Chief, Office of Appeals) (Appendix, Exh. D, ECF No. 96-2 at 34-36); and Plaintiff's deposition testimony (Appendix, Exh. A, ECF No. 96-2 at 3-23).[5]

In the FAC, Plaintiff alleges that he was obstructed from exhausting his administrative remedies as to Defendant at the institutional level, but that he repeatedly filed appeals anyway, which were rejected by Appeals Coordinator B. Daveiga to prevent exhaustion.    (FAC at 4.) Defendant asserts that Plaintiff never provided copies of the supposed rejections or what they say, and that he fails to identify any dates when he allegedly filed these appeals.  Defendant provides evidence that Plaintiff admitted in his deposition that he does not recall if he ever filed a 602 against Defendant, and he does not think that he ever had an appeal go to the third level regarding Defendant.  (Exh. A to Appendix, ECF No. 96-2, Bryant Depo. at 74:19-25, 84:8-9.)  Defendant also asserts that there is no record at KVSP of Plaintiff submitting any appeal against Defendant for retaliating against him and/or trying to have him assaulted by other inmates, (Exh. C to Appendix, ECF No. 96-2, Tarnoff Decl. ¶5), or having an appeal decided by the Office of Appeals at the third level of review relating to the allegation that Defendant tried to have other inmates attack Plaintiff or that she retaliated against him in any other way, (Exh. D to Appendix, ECF No. 96-2, Voong Decl. ¶9).  Defendant argues that there is no evidence that she (Waddle), the Appeals Coordinator, or anyone else interfered with his ability to exhaust Plaintiff's administrative

---

[5] All page numbers cited herein are assigned by the court's CM/ECF system and not based on the parties' pagination of their briefing materials.

remedies. Defendant provides evidence that she never instructed former KVSP Appeals Coordinator Daveiga or anyone else to screen out appeals filed against her by Plaintiff or any other inmate. (Exh. A to Appendix, ECF No. 96-2, Waddle Decl. ¶18.)

### C. **Plaintiff's Opposition**

Plaintiff claims that he did submit 602 appeals against Defendant, but that his appeals were improperly screened out, such that Plaintiff could not pursue his administrative remedies. Plaintiff submits as evidence his declaration and attached exhibits (ECF No. 203) and inmate Cleave McCloud's declaration of June 21, 2015. (See Exh. 6 to SSUF in support of defendant Castellanos' MSJ, ECF No. 92-9.) Plaintiff also requests the court to take judicial notice pursuant to Fed. R. Evid. 201 of the docket and entries in case 1:11-cv-00466 BAM (USDC Eastern District of California).[6]

Plaintiff argues that he satisfied his requirement to exhaust remedies because he submitted several 602 appeals against Defendant between August 18, 2011, and March 27, 2013, and these 602 appeals were repeatedly screened out for improper reasons or never responded to. (Bryant Decl. ¶7 and documents attached as Exhibit A thereto (ECF No. 203). Plaintiff declares that Appeals Coordinator Daveiga wrongfully screened the appeals out as duplicates or as "living conditions" appeals, when the appeals were not duplicates and addressed staff misconduct, not living conditions. (Id.) Plaintiff declares that he resubmitted the appeals with the appeal rejection letters he received, with handwritten notes explaining why they were wrongfully being screened

---

[6] The Court may take judicial notice of its own records in other cases. Fed. R. Evid. 201(b)(2); United States v. Wilson, 631 F.2d 118, 119–20 (9th Cir. 1980) (citations omitted). However, a court may not take judicial notice of the facts contained within documents of such court records. "The concept of judicial notice requires that the matter which is the proper subject of judicial notice be a fact that is not reasonably subject to dispute. Facts in the judicial record that are subject to dispute, such as allegations in affidavits and declarations . . . are not the proper subjects of judicial notice even though they are in a court record." Townes v. Paule, 407 F. Supp. 2d 1210, 1217 n.5 (S.D. Cal. 2005) (citation omitted); see also Lee v. City of Los Angeles, 250 F.3d 668, 690 (9th Cir. 2001) ("[W]hen a court takes judicial notice of another court''s opinion, it may do so not for the truth of the facts recited therein, but for the existence of the opinion, which is not subject to reasonable dispute over its authenticity.") (internal quotations and citation omitted). Thus, although a court may take judicial notice of court records, it may not take judicial notice of the truth of the contents of documents therein. See M/V American Queen v. San Diego Marine Constr. Corp., 708 F.2d 1483, 1491 (9th Cir. 1983) ("As a general rule, a court may not take judicial notice of proceedings or records in another cause so as to supply, without formal introduction of evidence, facts essential to support a contention in a cause then before it.") With these limitations, the court grants Plaintiff's request for judicial notice.

out, and also mailed them to the Director's Office requesting a response and protection and in a further effort to exhaust administrative remedies. (Id.) Plaintiff also asserts that Defendant told him that she had a friend in the appeals office who would see to it that none of his appeals would be processed or granted. (Id. ¶3.)

Plaintiff asserts that Defendant deceptively claims, in her motion for summary judgment, that Plaintiff failed to file a 602 appeal against her. Specifically, Plaintiff asserts that Defendant took one page of Plaintiff's deposition out of context and fails to provide the court with subsequent pages that explain that Plaintiff stated he filed a 602 appeal against Waddle and his appeals were improperly screened.

> Q. Because in your first amended complaint, I don't see anything about a specific date where you filed a written 602 against Lieutenant Waddle?
>
> A. Let me see my statement. Well, yeah, they—I filed—said on page 3 of the amended complaint that I submitted 602 appeals and staff misconduct complaints—on page 3—and that they were screened out by Ms. DeViega. And Ms. DeViega told me—no—Waddle told me before that she has a friend in the appeals office and that none of my appeals would ever be granted at that prison.

(Bryant Depo. at 75: 8-18.)

Plaintiff set forth in his FAC:

> I was deliberately obstructed from exhausting administrative remedies at the institutional level on some of the matters stated in this petition in bad faith by the prison officials I named herein. But despite this I did repeatedly submit the 602 appeals anyway and appeals coordinator DaViega has repeatedly rejected them to prevent exhaustion. And I also filed claims on all this with the VCGCB which were denied.

(FAC, ECF No. 16 at 3.)

Plaintiff further testified during his deposition why his 602 appeal against Defendant was screened out:

> Q. And specifically what was—what was the reason why your Complaint was screened out with regards to Lieutenant Waddle?

///

A.   Because they were trying to cover up what she was doing. She has a history of doing this.

(Bryant Depo. at 78: 6-10)

Q.   But—so when you received the screened out appeal, what did it say?

A.   Screened out due to living—they classified it living conditions. And I would have to get it to tell you exactly what it says.

Q.   So that's—specifically about your complaint against Lieutenant Waddle was screened out because it said it's about living conditions?

A.   They tried to keep it from being categorized as a staff misconduct complaint, because she was already being investigated for other stuff that she was subsequently found guilty of and disciplined for.

(Id. at 78:24 to 79:10).

Q.   What did you do after it was screened out on the first level?

A.   Wrote on there that they are screening it out illegally and submitted it back to them and told them why they're wrong.

Q.   And what happened after that?

A.   They screened it out again. I think I have two screened-out sheets on some of them.

Q.   Okay. Well you—

A.   And I wrote—and I would write on those that if you fail to process my appeal pursuant to state law and pursuant to your rules and regulations, you waive all defenses of failure to exhaust. And I documented that and I served it on them again with proof of services.

(Id. at 79:17 to 80: 6).

Plaintiff also finds Defendant's claims deceptive that "Bryant also admits that he does not think that he ever had an appeal go to the third level regarding Lieutenant Waddle," because Defendant has extracted one question out of context that does not provide Plaintiff's complete testimony.  Plaintiff asserts that in his deposition, he clarified that he believed he appealed the 602 to the third level, although he was not required to do so as his 602 appeals were improperly screened out at the first level.

Q.   So did you ever have an appeal go up to the third level regarding Lieutenant Waddle?

A.   I don't—I don't think so.

Q.   Okay. So you never got a response back from the third level?

A.   I think I mailed them a copy of the appeal with the screened-out sheets and what I wrote, and I mailed it to them and told them if you fail to provide me a response or process my appeal, you hereby waive any defenses of failure to exhaust, because you are not making any remedies available to me administratively. So I wrote that on there and I mailed a copy to them on several appeals because they refused to process them.

Q.   What dates did you write the third level?

A.   I don't know. I would have to find the dates for you.

Q.   Do you know approximate [*sic*] what dates?

A.   No, I don't know approximate dates.

Q.   And do you have copies of these letters?

A.   I would hope so.  If they're not missing from my property. I'm still trying to get my property from Corcoran.

(Id. at 84: 8 to 85:4).

Plaintiff also asserts that he received letters from Appeals Coordinator Daviega, screening out the 602 appeals he filed against Defendant.  Plaintiff submits three CDC-695 forms, which serve as first level screening for 602 appeals.  (Bryant Decl., ECF No. 203-2 at ¶7 and Exh. A at 12-14.)  These forms are dated September 12, 2011, November 22, 2011, and December 27, 2011.  (Id.)   The September 12, 2011, form 695 refers to another 602 appeal filed by Bryant on September 2, 2011.  (Id.)  The November 22, 2011, form 695 claims that the 602 appeal that it addresses was a duplicate of a 602 appeal filed on November 17, 2011.  (Id.)  Plaintiff asserts that the 602 appeal to which the September 12, 2011 form 695 related was resubmitted for improperly being screened as a cover-up for Waddle, and the 602 appeals to which the November 22, 2011, and December 27, 2011, 695 forms were resubmitted because they were improperly screened out as "living conditions," while in reality, these 602 appeals had to do with safety and security and

///

involved the allegations regarding Defendant's retaliation against Plaintiff for exercising his First Amendment rights.  (Id.)  The November 15, 2011, 602 appeal stated, in part:

> "I make this life or death emergency request to the institution head of KVSP due to an imminent threat of serious injury from retaliation by staff.  Nobody will tell the Warden the Real truth about what happened to me and how I was severely injured. Because of this I was assaulted by staff again on 11/9/11. B-1 Ad-seg officer hit me in the mouth busting my lip."

(Bryant Decl., ECF No. 203-2 at 15-16 (Exh. A).

Plaintiff also filed other appeals against Defendant after the FAC was filed, including one dated January 16, 2013, and another dated March 27, 2013. (Id. ¶17 and Exhibit A at 1-4.) Plaintiff alleges that neither of the appeals was responded to.  (Id.).

### D.  Defendant Waddle's Reply

Defendant asserts that Plaintiff does not dispute that he never had an appeal regarding his retaliation claims against her decided at the third level.  In reply to Plaintiff's argument that he filed several appeals which were improperly screened, Defendant argues that the appeals produced by Plaintiff in his opposition are insufficient to show that administrative remedies were not available to him.  Defendant discusses Plaintiff's appeals dated January 16, 2013, March 27, 2013, November 9, 2011, and November 15, 2011.   The court shall address these appeals and Defendant's arguments in the discussion that follows.

### E.  Discussion

There is no dispute that KVSP has a process available for prisoners to file grievances against prison staff.  In her motion to dismiss, Defendant provides sufficient evidence that there is no record at KVSP that Plaintiff submitted any appeal during the relevant time, accepted or screened out, against Defendant for retaliating against him and/or trying to have Plaintiff assaulted by other inmates.  (Tarnoff Decl., ECF No. 96-2 at 32-33 ¶¶7,8.)  Defendant also cites Plaintiff's deposition testimony in which Plaintiff states that he does not recall if he ever filed a 602 appeal against Defendant, and he does not think that he ever had an appeal go to the third level regarding Defendant.   (ECF No. 96-2, Exh. A to Appendix, Bryant Depo. at 74:19-25, 84:8-9.)   The court finds that Defendant has carried her initial burden to prove that there was an available

administrative remedy and that Plaintiff did not exhaust that available remedy.  Therefore, the burden shifts to Plaintiff to come forward with evidence showing that there is something in his particular case that made the existing and generally available administrative remedies effectively unavailable to him.

Plaintiff does not dispute the fact that he never successfully completed a form 602 appeal against Defendant through all three levels of review.  However, Plaintiff declares that he submitted appeals against Defendant that were either improperly screened out or not responded to.  Plaintiff provides copies of letters and 602 appeals he submitted and responses that he received in Exhibit A to his declaration.  (ECF No. 203-2, Exh A.)  Plaintiff states that he could not find copies of two of the appeals.  (Bryant Decl., ECF No. 203-2 ¶7.)  Plaintiff declares that the documents found in Exhibit A are "true and correct copies of some of the 602 appeals he submitted and the rejection letters described herein."  (Id.)

**Letters**

Plaintiff provides copies of letters dated August 2, 2011, August 3, 2011, August 9, 2011, September 28, 2011, March 7, 2012, March 19, 2012, June 3, 2012, and October 6, 2012, handwritten by Plaintiff to various places, including the Appeals Coordinator, Internal Affairs, and the Prison Law Office.  (ECF No. 203-2, Exh. D.)  Plaintiff also provides copies of responses he received, some which clearly informed him that "[i]t is important to note that the filing of a letter does not meet the criteria of the Prison Litigation Reform Act for exhaustion administrative remedies," and informing him of his right to file a 602 appeal.  (Id., Exh D at 37, 43, 49.)  There is evidence that Plaintiff sent some of the letters after he filed this lawsuit.  (Id. at 49, 50, 51, 52, 53.)  Nonetheless, none of these letters or replies are evidence of exhaustion of Plaintiff's administrative remedies at KVSP.  See Woodford, 548 U.S. at 91, 93 (exhaustion under the PLRA requires "compliance with an agency's deadlines and other critical procedural rules"); Wilson v. Wann, 2008 WL 4166886, *2 (E.D.Cal. Sept.8, 2008) (letters to Internal Affairs and warden were insufficient to show exhaustion); see also Lees v. Felker, 2009 WL 2824862, *5 (E.D.Cal. Sept.1, 2009) (letter to warden is not an alternative method to the inmate grievance process for exhausting administrative remedies).

**January 16, 2013, and March 27, 2013, Appeals**

Two of Plaintiff's appeals are dated January 16, 2013, and March 27, 2013. (ECF No. 203-2 at 8-10.) Defendant argues that these two appeals are dated two years after Plaintiff claims that Defendant allegedly threatened him, and the current appeals coordinator at KVSP has verified that there is no record that these appeals were ever submitted, accepted, or screened out by the appeals office. (Gonzales Decl., ECF No. 206-3 at 3 ¶4.) The court finds that these two appeals provide no evidence that Plaintiff still had administrative remedies available when he filed suit, because they are dated after December 26, 2012, the date he filed this lawsuit. Prisoners are required to exhaust the available administrative remedies *prior to filing suit*. <u>Jones</u>, 549 U.S. at 211 (emphasis added).

**November 9, 2011, Appeal – KVSP-0-11-01416**

Appeal KVSP-0-11-01416 was submitted by Plaintiff at the first level of review on November 9, 2011. Plaintiff complained as follows:

> On 11-9-11 CCI Quantum had me pulled out for court phone call at 8:30 AM, then Lt. Snow had my 115 hearing. They locked me in the cage and the big tall bald C/O went to pick up my property. I saw him throwing all my property in a trash can and I started hollering for the Sgt. That big C/O came and opened the cage and hit me in my mouth and told me to shut up or he will hit me again. They took all my property and told me I better not say nothing or I won't get some of my property ever again. Sgt. Sheldon came and said he is now moving me to building #2. He did that because he did not want me to get no witnesses names or declarations to the assault. This is just more retaliation for my legal work. And C/O Capello said if he was to go today he will come be my cellie and rape me every night. C/O Hefflefinger was standing there too so he heard it. The tall C/O who hit me threw a lot of my personal property in the trash and refused to let me see what or sent it home.

(ECF No. 203-2, Exh. C.)

Plaintiff requested action as follows:

> Somebody please come here to see me and investigate this assault and stop these officials from this continuous retaliation and threats, and somebody please help me get away from here to somewhere safe for me right away before I get murdered in here. Take me to ICC right away and endorse me to go to MCSP or RJD, because those are the 2 safest least violent CDCR prisons for SNY inmates. They don't allow gang banging and violence. I want to be financially compensated for that official hitting me in the mouth and splitting my lip today too. I want to mail home

all the property that C/O hit me took and threw in the trash.  I have a right to send it home because it's my personal property.  I want to be compensated for my property if it's missing.  I want C/O Capello charged for telling me he will rape me.

(Id.)

Defendant argues that this appeal fails to satisfy the exhaustion requirement because it does not pertain to Plaintiff's allegations against Defendant, but instead relates to Plaintiff's allegations that a bald correctional officer allegedly punched him in the mouth on November 9, 2011.  Defendant asserts that the appeal does not mention Defendant or indicate that she was involved in any way.  This appeal was accepted for review at the second level, but there is no evidence that it was reviewed at the second level, improperly screened out, or sent to the third level.

**November 15, 2011, Appeal**

Plaintiff's appeal dated November 15, 2011, complains as follows:

Life or death emergency request to the institution head of KVSP due to an imminent threat of serious injury from retaliation by staff.  Nobody will tell the warden the real truth about what happened to me and how I was severely injured. Because of this I was assaulted by staff again on 11/9/11.  A B1 Ad-Seg official hit me in the mouth busting my lip.  The OIA has not told the warden the truth about any of this.  I am a non-violent CDCR prisoner and I deserve to be safe from harm, retaliation, and severe harassment by staff.  Where I am transferred to will determine whether I will be safe.  Safety and security is the number one priority. Staff here at KVSP will not go against each other over an inmate and they cannot be trusted to investigate themselves or each other.  Not in this instance.  On 7/12/10, Lt. Stiles & Lt. Harden called me in to OIA and told me "they know" what happened to me, that staff had me assaulted.  Now they have amnesia.  They recorded the interview.  And it was recorded on 9/30/10 by Sgt. A. Sells.  I need to be transferred way from here and a safe place for me before I am assaulted again or any more of my property is broken and stolen by staff.  I been in Ad-Seg since 7/30/11 and mentally tortured by staff.  I am CCCMS and I need help.  I am digressing in my mental health rapidly.

(Id., Exh. A at 15-16.)

Plaintiff requested this action be taken:

Process this as an emergency appeal pursuant to OP Section 54100.17 due to imminent physical assault and personal injury risk.  Under Section [illegible] I have the right to appeal this condition [illegible] I request the warden to have me transferred to MCSP or RJD Level IV SNY right away by special transport because these are the 2 safest, least violent prisons.  To resolve & expunge the non-existent

enemy name Robinson from my 812 because he is not a enemy and never was. To get me transferred right away and out of Ad-Seg before my mental health deteriorates any further and I have to go on heavy medications again. If this can't be done please have the warden refer this issue to the DRB[7] and let them hear the 2 audio recordings OIA made on 7/12/10 & 9/30/10 and all subsequent ones and see all investigation reports & documents that were used or unused & re-written, and also the same thing from Gerald Bianes of the OIA in Bakersfield. Have the DRB listen to and review all that and let them decide to keep me safe. Recordings on 8/25/11, 9/30/11 by Mr. Bianes.

(Id.)

Defendant argues that this appeal fails to satisfy the exhaustion requirement as to Defendant, because the appeal does not mention Defendant. Defendant further asserts that Plaintiff's complaint does not mention being hit by the correctional officer, which is a separate issue.

Plaintiff submits three of the prison's responses to his appeals, which notified him that the appeals were being returned to him without a decision. The response dated September 12, 2011, rejects the appeal, referred to as "Segregation/SHU, 09/07/2011," at the first level of screening because "[y]our appeal has been rejected pursuant to the California Code of Regulations, Title 15, Section (CCR) 3084.6(b)(3) [because y]ou have exceeded the allowable number of appeals filed in a 14 calendar day period pursuant to CCR 3084.4(g)." (ECF No. 203-2 at 12.) Plaintiff has not argued that this appeal was screened out improperly.

The other two responses appear to be rejections of Plaintiff's November 15, 2011, appeal discussed above, which was re-submitted after the first rejection. The response dated November 22, 2011, rejects Plaintiff's appeal, titled by the prison as "Living Conditions, Other, 11/12/2011," at the first level of screening as a "[d]uplicate of appeal received on 11/17/11." (ECF No. 203-2 at 13.) Plaintiff argues, in notations on the response, that that this rejection is improper because his appeal is about "safety and security," not living conditions, and is not a duplicate appeal, "because I have never requested a DRB Review or Referral ever before." (Id.) The response dated December 27, 2011, rejects Plaintiff's appeal, titled by the prison "Living Conditions, Other, 12/21/2011," because it "concerns an anticipated action or decision," because "[y]ou may not

---

[7] Departmental Review Board

appeal to receive a DRB referral," and because the appeal "refers to previously filed staff complaints."  (Id. at 14.)  Plaintiff argues, in his notes written on the response, that the appeal should not have been rejected because it is not only a request for a DRB referral, but concerns a staff assault which happened on 11/9/11 and a request to be transferred to another prison.  He also writes that "staff here are being allowed to repeatedly harm me [and] I will be set up to be assaulted again real soon and B. DaVeiga is helping Lt. Waddle cover all this up."  (Id.)

Defendant argues that these rejections are not improper because Plaintiff did file a similar appeal just six days prior, and that Plaintiff's allegations against the correctional officer had already been processed and everything else Plaintiff noted in his appeal related to future events. Defendant also notes that Plaintiff was the one who characterized the November 11, 2011, appeal as a "Request for warden to make DRB Referral re imminent danger."  (ECF No. 203-2 at 15-16, 24-26.)

The court finds the screening-out of Plaintiff's November 15, 2011, appeal on November 22, 2011, and December 27, 2011, to be improper on the bases that (1) it is a duplicate of his November 9, 2011, appeal, (2) it concerns an anticipated action or decision, (3) it improperly requests a DRB referral, and (4) it refers to previously filed staff complaints.

First, the court finds that the November 15, 2011, appeal was improperly rejected as a duplicate of the November 9, 2011, appeal.  In the November 9, 2011, appeal, Plaintiff reports that a correctional officer slapped him in the mouth and took his property, and the appeal requests financial compensation for the assault and his missing property, to be allowed to send his property home, and to be transferred to another prison.

The November 15, 2011, appeal reports a life or death emergency due to an imminent threat of serious injury from retaliation by staff.  While the appeal does mention the assault by the correctional officer and Plaintiff's loss of property, these incidents are used as examples of recent retaliation and harassment by staff.  Plaintiff also reports that there is a recorded interview from November 30, 2010, in which he told Lt. Stiles and Lt. Harden about what is happening to him. Plaintiff also alleges that he is being mentally tortured by staff.  In the November 15, 2011, appeal, Plaintiff requests to be transferred to a safe place and to have this issue referred to the

Departmental Review Board (DRB) so they can listen to the recorded interview.  Based on these differences between the November 9, 2011, appeal and the November 11, 2011, appeal, the court finds that the November 15, 2011, appeal was improperly screened out as a duplicate of the November 9, 2011, appeal.

To the extent that the appeals coordinator considers Plaintiff's report of "an imminent threat of serious injury from retaliation by staff," to be an "anticipated action or decision" the court finds the rejection of the appeal on this basis to be improper, particularly because retaliation stems from an adverse action against Plaintiff and "the mere *threat* of harm can be an adverse action...."  Brodheim v. Cry, 584 F.3d 1262, 1270 (9th Cir. 2009).  Moreover, the appeals coordinator did not sufficiently indicate how Plaintiff could cure this deficiency.  See Cal. Code Regs. tit. 15, § 3084.6(a)(1)  ("Unless the appeal is cancelled, the appeals coordinator shall provide clear and sufficient instructions regarding further actions the inmate or parolee must take to qualify the appeal for processing.")

The court also finds the rejection of the appeal because Plaintiff "may not appeal to receive a DRB referral [and t]he appeal form is not a request form," to be improper.  The appeal form clearly *is* a "request form," as it includes a section for the prisoner to write down the "Action requested" by the prisoner.  (ECF No. 203-2 at 15.)  While it may be accurate that the appeals process is not the proper vehicle for requesting a DRB referral, rejecting Plaintiff's appeal on this basis alone, considering the substance of Plaintiff's appeal, appears improper, because pursuant to Cal. Code Regs. tit. 15, § 3084.1(a), the State of California provides its prisoners and parolees the right to appeal administratively "any policy, decision, action, condition, or omission by the department or its staff that the inmate or parolee can demonstrate as having a material adverse effect upon his or her health, safety, or welfare."

Finally, the court considers whether Plaintiff's November 15, 2011, appeal was sufficient to put defendants on notice of the nature of the wrongs alleged in his complaint against Defendant. Plaintiff alleged in that appeal, as he does in his FAC, that prison officials have retaliated against him since 2010, placing him in danger of further assault.  Plaintiff alleged that prison officials cannot be trusted to investigate themselves because staff at KVSP will not go against each other

23

///

over an inmate.  Plaintiff alleges that an interview with Plaintiff was recorded by Lt. Stiles, Lt. Harden, and Sgt. A. Sells on September 30, 2010, concerning the wrongs against him.

Plaintiff was not required to identify defendant Waddle by name to exhaust the grievance against her. Neither the PLRA itself nor the California regulations require an inmate to identify responsible parties or otherwise to signal who ultimately may be sued.  Sapp, 623 F.3d at 824 (citing See Jones, 549 U.S. at 217 ("[N]othing in the [PLRA] imposes a 'name all defendants' requirement.")). The court finds that Plaintiff's November 15, 2011, appeal, if accepted and processed through all levels of review, would have given prison officials a fair opportunity to respond to his complaints of retaliation by prison staff, including defendant Waddle, threatening assault or other bodily harm.  With respect to inmate appeals which prison officials elect to address on the merits, there need only be a "sufficient connection" between the claim set forth in the inmate appeal and the unidentified defendants, such that defendant prison officials were adequately put on notice of the substance of plaintiff's complaint. Reyes, 810 F.3d at 959.  As discussed above, such a connection exists here.  This is sufficient to put the prison on "notice of the alleged deprivation" for purposes of exhaustion under the PLRA.  (Id.)

Having found that Plaintiff filed an inmate appeal that sufficiently put the prison on notice of the nature of the wrong alleged in his retaliation claims, the court finds that Defendant has not established that Plaintiff failed to exhaust his available administrative remedies prior to filing suit.

**V.      SUMMARY JUDGMENT -- RETALIATION CLAIM**

**A.      Legal Standard -- Retaliation**

As discussed by the Ninth Circuit in Watison v. Carter:

> "A retaliation claim has five elements.  Brodheim v. Cry, 584 F.3d 1262, 1269 (9th Cir. 2009).  First, the plaintiff must allege that the retaliated-against conduct is protected. The filing of an inmate grievance is protected conduct. Rhodes v. Robinson, 408 F.3d 559, 568 (9th Cir. 2005).

> Second, the plaintiff must claim the defendant took adverse action against the plaintiff.  Id. at 567.  The adverse action need not be an independent constitutional violation.  Pratt v. Rowland, 65 F.3d 802, 806 (9th Cir. 1995).

"[T]he mere *threat* of harm can be an adverse action...."  Brodheim, 584 F.3d at 1270.

Third, the plaintiff must allege a causal connection between the adverse action and the protected conduct.  Because direct evidence of retaliatory intent rarely can be pleaded in a complaint, allegation of a chronology of events from which retaliation can be inferred is sufficient to survive dismissal.  See Pratt, 65 F.3d at 808 ("timing can properly be considered as circumstantial evidence of retaliatory intent"); Murphy v. Lane, 833 F.2d 106, 108–09 (7th Cir. 1987).

Fourth, the plaintiff must allege that the "official's acts would chill or silence a person of ordinary firmness from future First Amendment activities." Robinson, 408 F.3d at 568 (internal quotation marks and emphasis omitted). "[A] plaintiff who fails to allege a chilling effect may still state a claim if he alleges he suffered some other harm," Brodheim, 584 F.3d at 1269, that is "more than minimal," Robinson, 408 F.3d at 568 n.11.  That the retaliatory conduct did not chill the plaintiff from suing the alleged retaliator does not defeat the retaliation claim at the motion to dismiss stage.  Id. at 569.

Fifth, the plaintiff must allege "that the prison authorities' retaliatory action Thdid not advance legitimate goals of the correctional institution...."  Rizzo v. Dawson, 778 F.2d 527, 532 (9th Cir.1985).  A plaintiff successfully pleads this element by alleging, in addition to a retaliatory motive, that the defendant's actions were arbitrary and capricious, id., or that they were "unnecessary to the maintenance of order in the institution," Franklin v. Murphy, 745 F.2d 1221, 1230 (9th Cir.1984)."

Watison v. Carter, 668 F.3d 1108, 1114-15 (9th Cir. 2012).

Not every allegedly adverse action will support a retaliation claim.  See e.g. Huskey v. City of San Jose, 204 F.3d 893, 899 (9th Cir. 2000) (retaliation claim cannot rest on "the logical fallacy of post hoc, ergo propter hoc, literally, 'after this, therefore because of this'") (citation omitted).  However, an allegation of retaliation against a prisoner's First Amendment right to file a prison grievance is sufficient to support a claim under section 1983.  Bruce v. Ylst, 351 F.3d 1283, 1288 (9th Cir. 2003).

To raise a triable issue as to motive, a plaintiff must offer "'either direct evidence of retaliatory motive or at least one of three general types of circumstantial evidence [of that motive]', which usually includes: '(1) proximity in time between protected speech and the alleged retaliation; (2) [that] the [defendant] expressed opposition to the speech; [or] (3) other evidence that the reasons proffered by the [defendant] for the adverse . . . action were false and

pretextual.'" <u>McCollum v. California Dep't of Corr. & Rehab.</u>, 647 F.3d 870, 882 (9th Cir. 2011) (quoting <u>Allen v. Iranon</u>, 283 F.3d 1070, 1077 (9th Cir. 2002).

The Court must "'afford appropriate deference and flexibility' to prison officials in the evaluation of proffered legitimate penological reasons for conduct alleged to be retaliatory." <u>Pratt</u>, 65 F.3d at 807 (9th Cir. 1995) (quoting <u>Sandin v. Conner</u>, 515 U.S. 472, 482 (1995)). The burden is on Plaintiff to demonstrate "that there were no legitimate correctional purposes motivating the actions he complains of." <u>Pratt</u>, 65 F.3d at 808.

## B. Undisputed Facts

Unless otherwise noted, these facts are undisputed by the parties or as determined by the court based on a thorough review of the record.[8]

1.  Plaintiff, Kevin Bryant, a prisoner of the State of California, was housed at Kern Valley State Prison from 2009 to 2013. He is currently housed at Salinas Valley State Prison. (Exh. I to Appendix, Bryant's Movement History.)

2.  Defendant Waddle is currently employed by the California Department of Corrections and Rehabilitation ("CDCR") as a Correctional Lieutenant at Kern Valley State Prison ("KVSP"). She has held this position since 2008. (Exh. B to Appendix, Waddle Decl. ¶ 2.)

3.  Lieutenant Waddle interviewed inmate Bryant about his allegations on November 15, 2010. On December 8, 2010, Inmate Bryant was informed that an inquiry to his allegations was conducted and staff did not violate CDCR policy. (Exh. B to Appendix, Waddle Decl. ¶ 5; Exh. G to Appendix, Staff Complaint Response to Appeal #KVSP-O-10- 02161.)

4.  On November 30, 2010, Lieutenant Waddle endorsed Plaintiff for placement in Ad-Seg. The Administrative Segregation Unit Placement Notice states that the reason for placement is "jeopardizes integrity of an investigation of alleged serious misconduct or criminal

---

[8] These facts are taken from Defendant's Statement of Undisputed Facts (DUF), ECF No. 96-1 at 1-7; Plaintiff's Responses to DUF , ECF No. 203-1 at 1-9; and Defendant's Reply to Plaintiff's Responses to DUF, ECF No. 206-1 at 1-23. The court has considered all declarations and exhibits submitted in support of each statement, including pertinent portions of Plaintiff's deposition of January 19, 2016, lodged with the court pursuant to ECF No. 94.

activity." (Exh. B to Appendix, Waddle Decl. ¶ 6; Exh. H to Appendix, Administrative Segregation Unit Placement Notice from November 30, 2010.)[9]

5.     California Code of Regulations Title 15 Section 3335 states that one of the reasons an inmate will be placed in Administrative Segregation is if he endangers the institution's security or jeopardizes the integrity of an investigation of an alleged serious misconduct. (Exh. B to Appendix, Waddle Decl. ¶ 6.)

6.     Plaintiff claims that Lieutenant Waddle told him she was placing him in Administrative Segregation for his protection. (Exh. A to Appendix, Bryant Depo at 88:18-23.)

7.     Ultimately, the institution decided to move Bryant to Facility D Sensitive Needs Yard instead of Administrative Segregation. This decision was made by the facility captain, who signed the Administrative Segregation Unit Placement Notice on December 1, 2010. (Exh. B to Appendix, Waddle Decl. ¶ 8.)

8.     According to inmate Bryant's movement history, he was moved to Facility D Sensitive Needs Yard on December 4, 2010. (Exh. B to Appendix, Waddle Decl. ¶9; Exh. I to Appendix, Bryant's Movement History.)

9.     Bryant was never assaulted by any inmates he alleges were enlisted by Defendant Waddle. (Exh. A to Appendix, Bryant Depo at 90:17- 20.)

10.    Bryant does not allege that Lieutenant Waddle told him that she was going to have inmates assault him in building 1. (Exh. A to Appendix, Bryant Depo at 97:19-22.)

11.    Bryant never heard Lieutenant Waddle and Correctional Officer Sellers allegedly talk about having him assaulted. (Exh. A to Appendix, Bryant Depo at 98:10- 17.)

12.    Inmate McCloud was never offered compensation.

13.    Bryant never saw Lieutenant Waddle speak to inmate Moore about allegedly assaulting him. (Exh. A to Appendix, Bryant Depo at 104:15-17.)

14.    Bryant never saw Lieutenant Waddle speak to inmate Moore about allegedly assaulting him. (Exh. A to Appendix, Bryant Depo at 104:15-17.)

///

---

[9] Plaintiff disputes the reason that defendant Waddle decided to send him to Ad-Seg.

15. Bryant never heard Lieutenant Waddle and Officer Castellanos discuss having him assaulted.

16. Inmate Moore never assaulted Bryant.

17. Bryant never saw any Mexican inmates come to his cell to attack him on the day he alleges that inmate Moore set him up to be attacked. (Exh. A to Appendix, Bryant Depo at 29:16-30:9.)

18. Bryant believes that inmate Moore had enlisted two black inmates nicknamed Psych and Tennis to assault him. Bryant saw these inmates peek around the window in the rotunda. These inmates never actually attacked Bryant or said that they were going to. (Exh. A to Appendix, Bryant Depo at 104:20-105:13; 107:7-9.)

19. Bryant never saw Lieutenant Waddle speak to the control booth officer or anyone about doing anything to him. (Exh. A to Appendix, Bryant Depo at 109:19- 22.)

20. Lieutenant Waddle never assaulted inmate Bryant.

21. Bryant was never assaulted.

22. There is no record that Bryant had an appeal decided by the Office of Appeals at the Third Level of review relating to the allegation that Lieutenant Waddle tried to have other inmates attack inmate Bryant or retaliated against him in any other way. (Exh. D to Appendix, Voong Decl. ¶ 9.)

23. Bryant does not recall specifically speaking to the appeals coordinator about an appeal regarding Lieutenant Waddle. (Exh. A to Appendix, Bryant Depo. at 86:14- 19.)

24. Lieutenant Waddle is not aware of any appeals that inmate Bryant has filed against her regarding his allegations that she conspired to have him assaulted, which is the subject of this complaint. Lieutenant Waddle has never seen such an appeal, nor has any staff ever told her that such an appeal exists. (Exh. B to Appendix, Waddle Decl. ¶ 17.)

25. In 2010, the policy stated that if an appeal is not properly or timely submitted, it will be "screened out" and returned to the inmate without assigning a log number, with the reason for the screening, and instructions on how to correct the defect, if correction is possible. An inmate may resubmit his appeal for a subsequent review, and the appeal will then be

logged into the Inmate Appeal Tracking System (IATS) if the inmate followed all instructions given on the "screen out" and resubmitted it in a timely manner. (Exh. C to Appendix, Tarnoff Decl. ¶ 6.)

## C.    Defendant Waddle's Motion

Defendant Waddle moves for summary judgment on Plaintiff's claim for retaliation against her, on the grounds that there is no evidence that Plaintiff was assaulted, that Defendant ever conspired with anyone to have Plaintiff assaulted, or that Defendant's actions were motivated by Plaintiff's appeals or legal action against Officers Gallagher and Romero. Defendant asserts that although Plaintiff claims he was told by inmates McCloud and Moore that they were enlisted by Defendant to assault him, these inmates have signed statements flatly denying such allegations. Defendant further asserts that the undisputed evidence shows that Defendant moved Plaintiff to administrative segregation to preserve the integrity of the investigation as to his complaint against Officers Gallagher and Romero, not to have him assaulted or in retaliation for pursuing legal action.

Defendant offers as evidence the declarations of Defendant Waddle, inmate McCloud, and inmate Moore; Plaintiff's deposition testimony; and prison records including Bryant's Movement History, the Staff Complaint Response to Plaintiff's Appeal #KVSP-O-10-02161, and the November 30, 2010, Administrative Segregation Unit Placement Notice.

### 1.    Adverse Action

Defendant argues that there is no evidence that Plaintiff's Ad-Seg placement was an adverse action, and that evidence shows that Defendant approved Plaintiff to go to Ad-Seg to protect him while the investigation of his allegations against Officers Romero and Gallagher were pending. Defendant offers the following evidence.

California Code of Regulations Title 15 Section 3335 states that one of the reasons an inmate will be placed in Ad-Seg is if he jeopardizes the integrity of an investigation of an alleged serious misconduct. 15 CCR § 3335. Plaintiff himself admitted at his deposition that Defendant told him she was placing him in Ad-Seg for his protection:

///

Q. Okay. You said you guess. Did she ever say, "I'm moving you to D yard to have you assaulted"?

A. No. She said she was putting me in Ad-Seg –

Q. Okay. She said –

A. -- to protect me from Gallagher and Romero. I had been there six months since they assaulted me.

(Exh. A to Appendix, Bryant Depo at 88:18-23.)

Defendant asserts that throughout the FAC, Plaintiff states that whenever he felt threatened by other inmates or staff, he would ask to be placed in Ad-Seg. Defendant offers this example from the FAC: "I told both Rodriguez and Castellanos that I want to be put in Ad-Seg for my safety." (FAC at 8 ¶33.)

### 2. Conspiracy

Defendant also argues that there is no evidence that she conspired with Officer Sellers and inmate McCloud to have Plaintiff assaulted in April 2011, because a conspiracy requires a meeting of the minds, and there is no evidence of a meeting of the minds to have Plaintiff assaulted in alleged retaliation for pursuing legal action against Officers Romero and Gallagher. As evidence, Defendant offers excerpts from her declaration inmate McCloud's declaration, and Plaintiff's deposition testimony.

Lieutenant Waddle declared:

"I never threatened or assaulted inmate Bryant. I have never conspired with any officer, inmate, of any other individual to have inmate Bryant assaulted."

(Exh. B to Appendix, Waddle Decl. ¶¶ 12-13.)

"I have never heard any officer, inmate, or any other individual discuss having inmate Bryant assaulted."

(Id. ¶15.)

Plaintiff testified:

Q. Did you ever see Lieutenant Waddle speak to Inmate Moore about assaulting you?

A. No.

(ECF No. 96-2, Exh. A to Appendix, Bryant Depo at 103:15-17.)

Inmate McCloud declared:

"In response to the actual allegations contained in [Bryant's] declarations, I was never told by Correctional Officer Sellers to 'take care' of Mr. Bryant. I never talked with Officer Sellers about inmate Bryant at all. Likewise, I was never manipulated by Lieutenant Waddle, or offered any compensation to hurt other inmates, as one of [Bryant's] declarations suggests, and Lieutenant Waddle never promised 'to make my problems go away' if I would assault Mr. Bryant. I rarely talk with correctional staff about other inmates, and I have never talked with Lieutenant Waddle about Mr. Bryant."

(Exh. 6 to Castellanos MSJ, ECF No. 92-9, McCloud Decl. ¶ 5.)

At his deposition, Plaintiff testified that he never saw or heard Defendant and C/O Sellers talk about having him assaulted, and he has no evidence, except McCloud's alleged words, that Defendant enlisted inmate McCloud to assault him:

Q. Did you ever see Lieutenant Waddle or -- Did you ever specifically hear Lieutenant Waddle and Correctional Officer Sellers talk about having you assaulted?

A. "No. Not in front of me, no. They didn't -- I don't know what they talked about without me being there, but she was the one conspiring to have me moved to that building and with Sellers to have me assaulted."

(ECF No. 96-2, Exh. A to Appendix, Bryant Depo. at 98:10-17.)

Q. Is your -- do you have any evidence that Waddle enlisted McCloud other than McCloud's words to you?

A. No.

(Id. at 115:3-5.)

Regarding whether inmate McCloud ever signed any declarations for Plaintiff, McCloud declared:

"Counsel with the California Attorney General's Office informs me that Mr. Bryant has filed at least four declarations with the Court bearing my signature. Copies of these declarations are attached as exhibit A. I have reviewed these declarations and can confirm that I have never seen them before, and that I did not sign any of these four declarations for Mr. Bryant. The signature on these declarations is not mine."

(Exh. 6 to Castellanos MSJ, ECF No. 92-9, McCloud Decl. ¶4.)

"I do not know why Mr. Bryant has submitted these declarations. They are, however, fraudulent. I have not reviewed or signed any of these four declarations, and I have not authorized Mr. Bryant to sign them on my behalf."

(Id. ¶6.)

Defendant also argues that Plaintiff has no evidence of a conspiracy to assault him in July 2011, and asserts that Plaintiff's claims are even more convoluted and specious. Plaintiff testified in his deposition:

Q. Is this the same time period where you allege that the two inmates were -- two black inmates were going to assault you, or is this a different incident?

A. Yeah, that's -- right after that, I saw those two black inmates. I don't know if two Mexican inmates were there. But Officer Castellanos uses his porters to assault dozens of inmates. And every single time he testified that his inmates were the victims of the assault so that they wouldn't get in trouble but he had them assault the persons.

Q. Okay. So you saw two black inmates outside your cell?

A. Not outside my cell. I saw them peek around in the window in the rotunda. I just saw them out there. They walked over there and they walked back. So I know they're out in the rotunda where the officers are.

Q. Did they ever say they were going to assault you?

A. No. I told them that "I'm going to Ad-Seg."

(ECF No. 96-2, Exh. A to Appendix, Bryant Depo. at 104:20-105:13.)

Q. What are their nicknames?

A. Psych. And the other one is Tennis or something. Psych and Tennis. I don't know how to spell it.

(Id. at 107:7-9.)

Inmate McCloud denied this bizarre scenario:

"I never assaulted Bryant. I never planned to assault Bryant. I never came to Bryant's cell and informed him that Officer Castellanos had directed me to assault Bryant. I never informed Bryant that Officer Castellanos had directed me to gather other inmates for the purposes of assaulting Bryant. I never came to Bryant's cell for the purpose of luring him from his cell so that I, or other inmates, could assault him. I never told Bryant that officer Castellanos had paid me to assault Bryant."

(Exh. 6 to Castellanos MSJ, ECF No. 92-9, McCloud Decl. ¶3.)

Defendant states that Plaintiff has no evidence that she was involved, and that there is no connection between her and inmate Moore, or between her and the inmates who were allegedly going to stab Plaintiff. Plaintiff testified:

Q. Okay. How do you know she enlisted Castellanos?

A. These are the staff that she supervised.

(ECF No. 96-2, Exh. A to Appendix, Bryant Depo. at 103:19-20.)

Inmate R. Moore declared:

"I have been informed by the California Attorney General's Office that Bryant has alleged that I told him that I conspired with Officer E. Castellanos to assault him. This is not true. I have never conspired with any officer, including Officer Castellanos, to assault other inmates, including Bryant. I was not part of an inmate gang used by officer Castellanos, or any other officer, for the purposes of assaulting other inmates. I was never promised, nor did I ever receive, other inmates' property as payment for assaulting other inmates."

(Exh. 7 to Castellanos MSJ, ECF No. 92-9, Moore Decl. ¶2.)

"I never assaulted Bryant. I never planned to assault Bryant. I never came to Bryant's cell and informed him that Officer Castellanos had directed me to assault Bryant. I never informed Bryant that Officer Castellanos had directed me to gather other inmates for the purposes of assaulting Bryant. I never told Bryant that Castellanos has paid two Mexican inmates, or any other inmates, to assault Bryant. I never came to Bryant's cell for the purpose of luring him from his cell so that I, or other inmates, could assault him. I never told Bryant that Officer Castellanos had paid me to assault Bryant."

(Id. ¶3.)

### 3. **Because of Plaintiff's Protected Conduct**

Defendant argues that Plaintiff cannot establish that the retaliatory act was "because of" Plaintiff's protected conduct. Defendant argues there is no direct evidence that her motive to act was to retaliate against Plaintiff for pursuing legal action against Officers Romero and Gallagher, as shown by Plaintiff's deposition testimony that he never saw or heard Defendant discuss or plan the attempted assaults on him with any officer or inmate.

Defendant also asserts that there is no circumstantial evidence supporting Plaintiff's claim based on the timing of events, because Plaintiff alleges that Defendant found out about his claims

against officers Romero and Gallagher in November 2010, but Plaintiff alleges that Defendant orchestrated the inmate attacks against him 5-7 months later, in April and July 2011. Defendant argues that Plaintiff cannot show that she expressed opposition to his protected conduct, because Defendant denied it in her declaration, discussed above, and also denied that she threatened Plaintiff in any way.

> "Although I know Officers Romero and Gallagher, I am not personally friends with them. Even if I was, there is no reason why I would tell inmate Bryant to drop his appeal or lawsuit, nor is there any reason why I would threaten him. Inmates frequently file appeals and lawsuits against correctional officers and other staff members, and there is no reason why I would single out inmate Bryant."

(ECF No. 96-2, Exh. B to Appendix, Waddle Decl. ¶16.)

Based on the foregoing, the court finds that Defendant has met her burden of setting forth evidence that there is no genuine issue of material fact for trial, which shifts the burden to Plaintiff to submit admissible evidence showing the existence of genuine issues for trial.

### D. **Plaintiff's Opposition**

Plaintiff argues that a genuine dispute of material fact exists. Plaintiff submits as evidence the Complaint, FAC, Undisputed Facts, declarations of inmate McCloud, Plaintiff's own declaration, copies of Plaintiff's 602 appeals and responses, excerpts from Plaintiff's deposition testimony, and the court docket in case <u>Bryant v. Gallagher</u> (USDC ED Case #1:11-cv-00446-BAM).

On June 30, 2017, Defendant filed objections to Plaintiff's evidence on hearsay grounds, for lack of foundation, as irrelevant, as speculative, as unduly prejudicial, and for lack of authentication. (ECF No. 206-2.) The court notes Defendant's objections. If the court refers to any of Plaintiff's evidence in this order without addressing the objections, by implication the objections to that evidence are overruled.

### 1. **Adverse Action**

Plaintiff argues that there is a genuine dispute of fact as to what actions Defendant took against him and whether they were adverse.

**Solicitation of McCloud to Assault Bryant**

Plaintiff asserts that there is a dispute of fact as to whether Defendant told inmate McCloud to assault Plaintiff. A dispute exists because McCloud's declaration signed on April 24, 2017, contradicts McCloud's declaration signed on June 21, 2015. In the June 21, 2015, declaration, upon which Defendant relies, McCloud recants statements he made in prior declarations he signed in 2011, which supported Plaintiff's allegations:

> "In response to the actual allegations contained in [McCloud's prior] declarations, I was never told by Correctional Officer Sellers to 'take care' of Mr. Bryant. I never talked with Officer Sellers about inmate Bryant at all. Likewise, I was never manipulated by Lieutenant Waddle, or offered any compensation to hurt other inmates, as one of the declarations suggests, and Lieutenant Waddle never promised 'to make my problems ago away' if I would assault Mr. Bryant. I rarely talk with correctional staff about other inmates, and I have never talked with Lieutenant Waddle about Mr. Bryant."

(Exh. 6 to Castellanos MSJ, ECF No. 92-9, McCloud Decl. ¶ 5.)

In the April 24, 2017, declaration, McCloud changes his story again:

> "I have attached a copy of both the [2011] declarations I signed for inmate Bryant here to and declare under oath these are true and correct copies of the originals I signed in 2011 and I have signed and dated them again today 4/24/17 below my previous signature." . . . Everything I said about Lt. Waddle paying me to assault other inmates in my staff complaint, my lawsuit against her and in the attached declarations is completely true and I only said and signed anything to the contrary to protect myself."

(Exh. B to Plaintiff's Declaration, ECF 203-2 at 20.)

Plaintiff argues that this evidence creates a genuine dispute of material fact as to what Defendant told McCloud and the veracity and credibility of both with respect to their testimony regarding the same.

**Placement of Plaintiff in Ad-Seg**

Plaintiff argues that the facts differ as to why Defendant tried to place Plaintiff in Ad-Seg. Plaintiff claims that Defendant tried to place him in Ad-Seg so he could be assaulted:

> "On November 30, 2010, Defendant Waddle escorted me from my cell to the program office where she showed me the October 2, 2010 staff misconduct complaint that I filed against Officers Gallagher and Romero. She then recommended that I be put in Administrative Segregation and told me it was for my

safety and protection. I was moved to Ad Seg, and then later to Facility D, on December 4, 2010 pursuant to the recommendation of Defendant Waddle for the specific purpose of having me assaulted for the appeals and lawsuit I filed against prison employees and Waddle's staff."

(Bryant Decl., ECF 203-2 ¶¶4, 5.)

However, Defendant claims that the only reason she attempted to place Plaintiff in Ad-Seg was to protect him and ensure his safety while an investigation as to his allegations of Romero and Gallagher were looked into:

"It was recommended that inmate Bryant be placed in Administrative Segregation in order to preserve the integrity of the investigation of staff misconduct relating to inmate Bryant's allegations against Officer Romero and Officer Gallagher. I signed the Administrative Segregation Unit Placement Notice on November 30, 2010. Bryant was recommended for Administrative Segregation pursuant to California Code of Regulations Title 15 Section 3335, which states that one of the reasons an inmate will be placed in Administrative Segregation is if he endangers the institution's security or jeopardizes the integrity of an investigation of an alleged serious misconduct. Inmate Bryant was not recommended to be moved as retaliation for filing an appeal against Officers Romero and Gallagher, nor was he moved in an attempt to have him assaulted."

(Waddle Decl., Exh. B to Appendix, ECF No. 96-2 at 25 ¶¶6-7.) Attached as Exhibit "H" is a true and accurate copy of the Administrative Segregation Unit Placement Notice from November 30, 2010. Defendant argues that her approval therefore was not an adverse action nor was it done to jeopardize Plaintiff's safety, but the very opposite.

As to whether Defendant acted because of Plaintiff's appeals against Officers Romero and Gallagher, Defendant claims that she only knew about Plaintiff's staff conduct complaint against Gallagher and Romero for interfering with his mail and appeals, not about Plaintiff's complaint against them for having him assaulted:

"The only appeal submitted by inmate Bryant involving Officer Romero and Officer Gallagher, which I reviewed was Appeal # KVSP-O-10-02161. In this appeal, inmate Bryant alleged that Officer Romero and Officer Gallagher were interfering with his mail and appeals. I interviewed inmate Bryant about his allegations on November 15, 2010. On December 8, 2010, Inmate Bryant was informed that an inquiry to his allegations was conducted and staff did not violate CDCR policy. Attached as Exhibit "G" is a true and accurate copy of the Staff Complaint Response to Appeal # KVSP-O-10-02161."

(Waddle Decl., Exh. B to Appendix, ECF No. 96-2 at 25 ¶5.)

Plaintiff questions Defendant's credibility in stating that she did not know about Plaintiff's staff misconduct complaint against Gallagher and Romero for having Plaintiff assaulted, because this complaint raises safety concerns that would warrant moving Plaintiff to Ad-Seg, whereas the appeal concerning mail and appeals does not raise such concerns.

Plaintiff also argues that Defendant's claim that she transferred Plaintiff to Ad-Seg for his safety is suspect because Defendant did not recommend Plaintiff's placement in Ad-Seg until November 30, 2010, over two weeks after Defendant claims to have interviewed Plaintiff regarding his staff complaint on November 15, 2010. (Waddle Decl., Exh. B to Appendix, ECF No. 96-2 at 25 ¶6) (quoted hereinabove).

**Solicitation of Moore to Assault Bryant**

Plaintiff argues that there is a dispute of fact whether there was a direct connection between Defendant and Inmate Moore. Defendant refers to testimony in Plaintiff's deposition in support of her argument that there was no direct connection:

Q. Who enlisted Inmate Moore?

A. Castellanos.

Q. Did Lieutenant Waddle enlist Inmate Moore?

A. She enlisted Castellanos.

Q. Okay. How do you know she enlisted Castellanos?

A. These are the staff that she supervised. . .

(ECF No. 96-2, Exh. A to Appendix, Bryant Depo. at 103:15-21.)

Plaintiff asserts that Defendant deceptively left out lines of testimony that show a connection between Waddle and Moore, for example:

A. These are the staff that she supervised. And she's had them assault other people that have been investigated for that, too.

Q. Okay. So you're just basing it based on the fact that she supervised Castellanos?

A. I based it based on the fact that she told me I was gonna leave there in a body bag and she was gonna get me. She threatened to do this to me already.

(Id. at 103:21 – 104:3.)

Plaintiff also points to his deposition testimony stating that "Inmate Moore told me that Castellanos told him to assault me and ma[k]e me drop my cases and my complaints against staff." (ECF No. 203-2, Exh. E to Plaintiff's Declaration, Bryant Depo. at 11:20-22.) However, the court finds that inmate Moore's statement is inadmissible hearsay. Fed. R. Evid. 802.

**E.   Discussion**

The court finds genuine issues of material fact as to whether Defendant acted adversely against Plaintiff and whether her actions were in retaliation for Plaintiff filing appeals and a lawsuit.

### 1.   First Amendment Exercise

The parties do not dispute that on October 2, 2010, Plaintiff filed a form 602 prison appeal against Officers Romero and Gallagher for interfering with Plaintiff's mail and appeals, that Plaintiff filed an appeal regarding his claim that Officer Romero and Officer Gallagher conspired to have him assaulted, that on March 17, 2011, Plaintiff filed a lawsuit against Officers Romero and Gallagher, and that Plaintiff filed several appeals against defendant Waddle in 2011 through 2013. These facts are sufficient to satisfy the first element of a retaliation claim, demonstrating that Plaintiff exercised his protected rights under the First Amendment.

### 2.   Adverse Action

The parties do not dispute that on November 30, 2010, Defendant recommended that Plaintiff be placed in Administrative Segregation, or that the form signed by Defendant stated that Plaintiff was being placed there "after making allegations of staff misconduct [and] based upon the aforementioned information you will remain in Administrative Segregation pending investigation into staff misconduct." (ECF No. 96-2, Appendix Exh. H.) However, the parties dispute the reason that Defendant recommended this placement for Plaintiff. Plaintiff contends that Defendant sought to place him in Ad-Seg to have him assaulted by other inmates, whereas Defendant declares that Plaintiff was recommended for Ad-Seg pursuant to California Code of Regulations Title 15 Section 3335, which states that one of the reasons an inmate will be placed in Ad-Seg is if he endangers the institution's security or jeopardizes the integrity of an investigation of an alleged serious misconduct. (Waddle Decl., ECR No. 96-2, Appendix Exh. B ¶7.)

Plaintiff's evidence of Defendant's state of mind when she recommended Ad-Seg for Plaintiff is disputed. Plaintiff declares that in April 2011, Defendant told him that "the only way I would leave the prison was in a body bag and that I better be very careful about which staff I write 602 appeals, complaint and lawsuits against and what I say in those documents." (Bryant Decl., ECF No. 203-2 at 2 ¶6.)    Defendant declares that she "never threatened or assaulted inmate Bryant." (Waddle Decl., ECF No. 96-2, Appendix Exh B. ¶12.)  Thus, the parties dispute whether Defendant made threats to Plaintiff and whether she was in a state of mind to have Plaintiff assaulted for filing appeals.

Plaintiff also alleges that Defendant conspired with other officers and inmates to have him assaulted.    However, Plaintiff has presented no admissible evidence of a conspiracy, and Defendant denies any conspiracy.  Plaintiff declares that Inmate McCloud "told him in 2011 that he had assaulted inmates when asked by Waddle in exchange for payment and favors from Waddle" and that "on or about August 16, 2011, Waddle told him to assault me in Ad Seg." (Bryant Decl., ECF No. 203-2 at 3 ¶9.)  Plaintiff also declares that he "learned from inmate Moore that Castellanos and Waddle were trying to have me assaulted by him and other inmates."  (Id. at 4 ¶14.)   The court finds that these statements by McCloud are inadmissible hearsay.   Defendant declares that she has "never conspired with any officer, inmate, or any other individual to have inmate Bryant assaulted[, nor has she ever "heard any officer, inmate, or any other individual discuss having inmate Bryant assaulted."  (Waddle Decl., ECF No. 96-2, Appendix Exh B. ¶13, 14.)  Thus, the court finds no admissible evidence that Defendant conspired with others to arrange for Plaintiff to be assaulted.

Based on the evidence, the court finds that a genuine issue exists as to whether Defendant took an adverse action against Plaintiff.

### 3.    Because of Plaintiff's Exercise of His Rights

The facts are disputed as to whether Defendant acted against Plaintiff *because* Plaintiff filed prison appeals and a lawsuit.  Plaintiff declares that on November 30, 2010, before Defendant recommended that Plaintiff be placed in Ad-Seg, she "escorted me from my cell to the program office where she showed me the October 2, 2010, staff misconduct complaint that I filed against

Officers Gallagher and Romero." (Bryant Decl., ECF No. 203-2 at 2 ¶4.) See Pratt, 65 F.3d at 808 ("timing can properly be considered as circumstantial evidence of retaliatory intent"); Murphy, 833 F.2d at 108–09. Defendant has not disputed that she showed Plaintiff the appeal and then made her recommendation.

Plaintiff also alleges that Defendant was friends with Officers Romero and Gallagher, declaring:

> "I know that Lieutenant Waddle is friendly with officers Romero and Gallagher. In my experience from being incarcerated for over 25 years, I have learned that prison staff stick together. . . I also know that prison officials do not like it when the employees who they are responsible for are found guilty of misconduct. It reflects negatively on these officials since they are in charge and responsible for subordinate officers. Gallagher and Romero were subordinate officers of Lieutenant Waddle and she was supervising them on the June 8, 2010 when I was assaulted."

(Id. at 5-6 ¶18.)

Defendant declares:

> "Although I know Officers Romero and Gallagher, I am not personally friends with them. Even if I was, there is no reason why I would tell inmate Bryant to drop his appeal or lawsuit, nor is there any reason why I would threaten him. Inmates frequently file appeals and lawsuits against correctional officers and other staff members, and there is no reason why I would single out inmate Bryant."

(Waddle Decl., ECF No. 96-2, Appendix Exh B. ¶16.)

Plaintiff's allegation that Defendant warned him that he better be very careful about which staff he writes 602 appeals, complaints, and lawsuits against and what he says in those documents is also a disputed fact, as discussed above.

Based on the evidence, the court finds that a genuine issue exists as to whether Defendant took an adverse action against Plaintiff *because* Plaintiff filed appeals or a lawsuit.

**Chilling Effect**

As to a chilling effect, the Ninth Circuit has explained that the proper analysis of such a retaliation claim is not whether a plaintiff was actually chilled in the exercise of his constitutional rights. Brodheim, 584 F.3d at 1271. Rather, an objective standard applies. Id. Under that objective standard, the court cannot say as a matter of law that a reasonable person would not have

been chilled in the exercise of his constitutional rights by Defendant's alleged acts of recommending Plaintiff's placement in Ad-Seg so Plaintiff would be assaulted, threatening to put Plaintiff in a body bag, or making other threats against Plaintiff. If a jury were to credit Plaintiff's testimony and draw an inference of retaliation for the filing of the inmate appeal based on the timing of the recommendation of his placement in Ad-Seg, the jury could properly conclude that the resulting transfer to administrative segregation would chill a reasonable person in the exercise of the right to file an inmate appeal.

### Legitimate Correctional Purpose

While Defendant argues that she recommended Plaintiff's placement in Ad-Seg for a legitimate correctional purpose, the proximity in time to Defendant allegedly showing Plaintiff a copy of his inmate appeal could reasonably support a jury finding for Plaintiff on the issue. Defendant may very well have believed that Plaintiff posed a threat to the institution based on the possibility he may jeopardize an ongoing investigation. And after considering the testimony of Defendant as well as Plaintiff, a reasonable jury might fully credit Defendant's explanation for her recommendation to transfer Plaintiff to Ad-Seg. Preserving institutional order, discipline, and security are legitimate penological interests that, if they in fact motivated acts taken, will defeat a retaliation claim. See Barnett v. Centoni, 31 F.3d 813, 816 (9th Cir. 1994); Rizzo, 778 F.2d at 532. But a genuine dispute over this material issue of fact requires that it be resolved at trial. "[P]rison officials may not defeat a retaliation claim on summary judgment simply by articulating a general justification for a neutral process, when there is a genuine issue of material fact as to whether the action was taken in retaliation for the exercise of a constitutional right." Bruce, 351 F.3d at 1289–90. If a jury finds that Defendant threatened to put Plaintiff in a body bag, in retaliation against him for filing inmate appeals, it could reasonably find for Plaintiff. See id. at 1289 ("But, if, in fact, the defendants used the gang validation procedure as a cover or a ruse to silence and punish Bruce because he filed grievances, they cannot assert that Bruce's validation served a valid penological purpose, even though he may have *arguably* ended up where he belonged.") (citing Rizzo, 778 F.2d at 532).

///

## F.     Conclusion

In sum, the court finds that Plaintiff has submitted sufficient evidence to establish a genuine issue of material fact as to whether Defendant retaliated against him. A trier of fact will consider the credibility of the parties and their witnesses and determine the weight to give to that testimony, a determination which cannot be made on summary judgment. Nelson v. City of Davis, 571 F.3d 924, 927 (9th Cir. 2009). Accordingly, it is recommended that Defendant's motion for summary judgment on Plaintiff's retaliation claim against her be denied.

## VII.     QUALIFIED IMMUNITY

Defendant argues that she is entitled to qualified immunity for endorsing Plaintiff to be housed in Ad-Seg.

### A.     Legal Standard

"Qualified immunity shields government officials from civil damages liability unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct." Taylor v. Barkes, --- U.S. ---, 135 S.Ct. 2042, 2044 (June 1, 2015) quoting Reichle v. Howards, 566 U. S. 658, 132 S.Ct. 2088, 2093 (2012). Qualified immunity analysis requires two prongs of inquiry: "(1) whether 'the facts alleged show the official's conduct violated a constitutional right; and (2) if so, whether the right was clearly established' as of the date of the involved events 'in light of the specific context of the case.'" Tarabochia v. Adkins, 766 F.3d 1115, 1121 (9th Cir. 2014) quoting Robinson v. York, 566 F.3d 817, 821 (9th Cir. 2009). These prongs need not be addressed in any particular order. Pearson v. Callahan, 555 U.S. 223, 129 S.Ct. 808 (2009).

To determine whether a government official should be granted qualified immunity, under the first prong, the facts are to be viewed "in the light most favorable to the injured party." Chappell v. Mandeville, 706 F.3d 1052, 1058 (9th Cir. 2013) quoting Saucier v. Katz, 533 U.S. 194, 201, 121 S.Ct. 2151 (2001), receded from on other grounds by Pearson, 355 U.S. at 817-21; see also Bryan v. MacPherson, 630 F.3d 805, 817 (9th Cir. 2010). However, the existence of a material factual dispute does not necessarily preclude a finding of qualified immunity. Estate of Ford v. Ramirez-Palmer, 301 F.3d 1043, 1053 (9th Cir. 2002).

1   Under the second prong, clearly established law is not to be defined "at a high level of

2   generality." <u>Mullenix v. Luna</u>, --- U.S. ---, 136 S. Ct. 305, 308 (2015) quoting <u>Ashcroft v. al-Kidd</u>,

3   563 U.S. 731, 742, 131 S.Ct. 2074 (2011).  "The dispositive question is 'whether the violative

4   nature of particular conduct is clearly established.'"  <u>Id.</u> (emphasis added in <u>Mullinex</u>).  "This

5   inquiry "''must be undertaken in light of the specific context of the case, not as a broad general

6   proposition.'"''"  <u>Id.</u>, quoting <u>Brosseau v. Haugen</u>, 543 U.S. 194, 198, 125 S.Ct. 596 (2004) (per

7   curiam) (quoting <u>Saucier</u>, 533 U.S. at 201).  "The relevant inquiry is whether existing precedent

8   placed the conclusion that [the defendant] acted unreasonably in the [specific circumstances

9   confronted] 'beyond debate.'"  <u>Id.</u>, at 309 (quoting <u>al–Kidd</u>, 563 U.S. at 741).

10   "To be clearly established, a right must be sufficiently clear that every reasonable official

11   would have understood that what he is doing violates that right."  <u>Reichel</u>, 132 S.Ct. at 2092; <u>see</u>

12   <u>also</u> <u>Castro v. County of Los Angeles</u>, 833 F.3d 1060, 1067 (9th Cir. 2016).  "When properly

13   applied, [qualified immunity] protects all but the plainly incompetent or those who knowingly

14   violate the law."  <u>al-Kidd</u>, 563 U.S. at 743 (citation and internal quotation marks omitted).  "We

15   do not require a case directly on point, but existing precedent must have placed the statutory or

16   constitutional question beyond debate."  <u>Id.</u>, at 741.  "[A] 'robust consensus of cases of persuasive

17   authority'" in the Courts of Appeals could establish the federal right [in question]."  <u>City and</u>

18   <u>County of San Francisco v. Sheehan</u>, --- U. S. ---, 135 S.Ct. 1765, 1778 (2015).

19   **B.     <u>Parties' Positions</u>**

20   Defendant argues that she did not violate Plaintiff's First Amendment rights, as there is no

21   evidence that she took adverse action against Plaintiff or that her alleged actions were motivated to

22   chill Plaintiff's right to pursue appeals and legal claims.  Defendant also argues that it would not

23   have been clear to a reasonable official that her actions in the same circumstances as defendant

24   Waddle could have violated Plaintiff's constitutional rights, specifically that it was unlawful for

25   her to approve Plaintiff for Ad-Seg. to preserve the integrity of an investigation under California

26   Code of Regulations Title 15 Section 333.

27   Plaintiff responds that Defendant failed to address all of Plaintiff's allegations when

28   arguing that qualified immunity applies, including allegations that Defendant solicited

Castellanos, Moore, and McCloud to assault Plaintiff or arranged to have others do it. Plaintiff argues there can be no qualified immunity for those actions as no reasonable prison official would have any doubt that such conduct was a blatant violation of Plaintiff's civil rights. With respect to the allegation that Defendant attempted to place Plaintiff in Ad-Seg., Plaintiff argues that because a dispute of fact exists as to the real reason defendant was placing Plaintiff in Ad-Seg, qualified immunity will not allow her to escape liability at this juncture.

### C. **Discussion**

As discussed above, triable issues of fact exist as to whether Defendant recommended Plaintiff for placement in Ad-Seg, threatened Plaintiff, or attempted to arrange assaults against Plaintiff as retaliation for filing an inmate appeal or lawsuit. Nonetheless, the state of the law in 2010, when the alleged constitutional violations took place, was well established and sufficient to give defendant fair warning that she could not retaliate against an inmate for filing an appeal or lawsuit. As early as 1995, "the prohibition against retaliatory punishment [was] clearly established law in the Ninth Circuit for qualified immunity purposes." See Pratt, 65 F.3d at 806. The court finds that it would have been clear to a reasonable correction lieutenant, knowing what Defendant knew (viewed in the light most favorable to Plaintiff) that recommending Plaintiff for placement in Ad-Seg, threatening Plaintiff, or attempting to have Plaintiff assaulted as retaliation for filing an inmate appeal or lawsuit would be constitutionally impermissible. Accordingly, the court finds that Defendant is not entitled to summary judgment based on qualified immunity.

## VIII. RECOMMENDATIONS AND CONCLUSION

The court finds, based on the record before it, that Plaintiff exhausted his available administrative remedies for his retaliation claim before filing suit, as required by the Prison Litigation Reform Act, 42 U.S.C. § 1997e(a). As for the retaliation claim itself, the court finds that genuine factual disputes exist as to whether Defendant took any adverse action against Plaintiff because Plaintiff exercised his right to file prison appeals and lawsuits. Further, the court finds that Defendant is not entitled to qualified immunity for her actions. Accordingly, Defendant's motion for summary judgment, filed on April 1, 2016, should be denied.

Therefore, based on the foregoing, **IT IS HEREBY RECOMMENDED** that:

1.      Defendant Waddle's motion for summary judgment based on Plaintiff's failure to exhaust administrative remedies, filed on April 1, 2016, be DENIED;

2.      Defendant Waddle's motion for summary judgment on Plaintiff's retaliation claim against her, filed on April 1, 2016, be DENIED; and

3.      Defendant Waddle's request for summary judgment based on qualified immunity, filed on April 1, 2014, be DENIED.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of Title 28 U.S.C. § 636(b)(l).  **Within fourteen (14) days** after being served with these findings and recommendations, any party may file written objections with the court.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections shall be served and filed within ten days after service of the objections.  The parties are advised that failure to file objections within the specified time may result in the waiver of rights on appeal.  Wilkerson v. Wheeler, 772 F.3d 834, 838-39 (9th Cir. 2014) (citing Baxter v. Sullivan, 923 F.2d 1391, 1394 (9th Cir. 1991)).

IT IS SO ORDERED.

Dated:   **July 17, 2017**                    **/s/ Gary S. Austin**
                                                     UNITED STATES MAGISTRATE JUDGE